### In the Matter of Jewett, Bankrupt.

(*District Court, W. D. Wisconsin.* July 22, 1880. )

1. BANKRUPTCY — VOLUNTARY CONVEYANCES — FRAUD. — Conveyances made by a bankrupt to his sons, more than eight months prior to the filing of his petition, sustained, under the circumstances of this case, although the creditors were probably not barred by the lapse of time, and the transaction, without the testimony of the bankrupt, might have been taken as an attempt to hinder and delay creditors.

2. SAME—PROPER BOOKS OF ACCOUNT—BURDEN OF PROOF.—In this case the burden of showing to the court that the bankrupt's books of account were not properly kept lay upon the creditors, who alleged it in their specifications, when it appeared that full sets of books were kept by regular book-keepers, hired and kept for that purpose; that such books were all regularly turned over by the bankrupt, with the other property, to the assignee in bankruptcy, and kept by him in his office, all during the pendency of the bankruptcy proceedings, subject to examination and inspection by the creditors; and that when the proceedings in bankruptcy were closed, and the property all sold to one purchaser, under an order of the court, the said books were turned over to such purchaser, together with the other property.

3. SAME—SAME—OMISSION OF ENTRIES.—The omission of the bankrupt to enter upon the books of the firm certain accommodation notes, given as an individual partner, would not, under the circumstances of this case, defeat his right to a discharge.

4. SAME—SAME—SAME.—The receipt by the bankrupt of money from an agent of the firm, and expended by himself personally in the business, and not entered upon the regular account books kept by the book-keeper, but entered on a separate book kept by the bankrupt, would not, under the circumstances of this case, defeat his right to a discharge.

In Bankruptcy. Decision of the court on the trial of the specifications.

*Vilas & Bryant*, for bankrupt.

*J. C. Sloan, Baker & Spooner* and *Judge Young*, for opposing creditors.

BUNN, D. J. So far as the allegations go, showing that the bankrupt made fraudulent preferences in paying some of his creditors in full before proceedings in bankruptcy were begun, I think the opposing creditors are barred on the question of time, the allegations and proofs showing that the preferences were made eight months previous to the filing of the petition.

As regards the conveyances made to his sons in the fall of 1875, allowing that the creditors are not barred on the matter of time—and I am inclined to think they are not, though the acts complained of were committed eight months or more before the filing of the petition—still, I am not at all satisfied they were made in contemplation of bankruptcy, or to prevent his property coming into the hands of the assignee, or

being distributed in satisfaction of his debts. There is no testimony on the question of the intent, except that of the bankrupt, and what may be gathered from the nature of the acts themselves. Jewett swears it was not done with any such intent; that he did not contemplate bankruptcy at that time; that he had property enough to pay the debts of the firm more than twice over, and that he made these conveyances of his interest in the land and the property for the purpose of making a new business firm, and going on and paying the debts of the partnership of S. A. Jewett & Co., and that it never entered his mind of hindering or delaying his creditors, or preventing the property being distributed in satisfaction of his debts; that one leading notion was to put things in shape, that the creditors of his own firm should be paid, and not those of his brothers, whose firms had failed in the east; that it was all done with the knowledge of his principal creditors, at Hudson and St. Paul, who constituted the bulk of the creditors.

Though it was rather a crude transaction, and on the face of it, without other explanation, might be taken as an attempt to cover up, or to hinder and delay his creditors, still, taking into account Jewett's testimony and all the circumstances, I am satisfied the object and motive of the whole transaction was, as he says, to put things in shape, when the business should be carried on and the creditors of the firm get their pay, to the exclusion of the creditors of the eastern firms. And I scarcely think the creditors of S. A. Jewett & Co. can complain, whatever might be said as to the eastern creditors, who were the creditors of Jewett & Pitcher, and the other firms in Massachusetts and Maine, but not the creditors of S. A. Jewett & Co. The testimony shows it was the failure of these eastern firms that first embarrassed the transactions of the firm of S. A. Jewett & Co.; and the conduct of Jewett soon afterwards, in consulting with his creditors and following their advice, in the matter of beginning proceedings to wind up the partnership, tends to confirm the view that he was not trying to cover up his property or to keep it from the payment of his debts.

On the other branch of the case, as to keeping proper books of account, I have had much more difficulty. The case in this respect stands in a peculiar position. Though it appears that very extensive books were kept all through the years of the life of the firm, the defendant's attorney stating that he shipped two dry goods boxes full away from the office of the assignee in bankruptcy, to whom the bankrupts turned them over, to the purchaser of the partnership effects from the assignee, still, these books are not before the court, nor has any witness been sworn in regard to the sufficiency of these books, except S. A. Jewett, the bankrupt, who did not keep them, and says he knows but little about them. A good deal of discussion was had as to where the burden of proof lies in such a case, the attorney for the opposing creditors insisting that it is upon the bankrupt to show and satisfy the court that the books were properly kept.

But, in the circumstances of this case, it appearing that full sets of books were kept by regular book-keepers, hired and kept for that purpose; that they were all regularly turned over by the bankrupts with the other property to the assignee in bankruptcy, kept by him in his office all during the pendency of the proceedings, subject to examination and inspection by the creditors, and when the proceedings in bankruptcy were closed, and the property all sold to one purchaser, under the order of the court, the books were turned over to such purchaser with the other property, and taken away to different parts of the country, I think the burden of showing to the court that the books were not properly kept lies with the creditors, who allege it in their specifications. The bankrupt was notified to produce the books on the trial of the specifications, filed by the creditors in opposition to his discharge. His answer, under oath, is that he is not able to do so; that they are not his, nor under his control, and that he has neither time nor money to enable him to bring them before the court. I think it a good answer. And the truth is, that without the books there is not evidence enough before the court to determine with any satisfaction whether the books were kept properly or not. The counsel for the creditors relies largely

upon certain statements made by the bankrupt on his examination, taken *ex parte* before the register; and there are some of these statements which, if taken alone, would tend to show that the entries were not all properly made, nor kept as they should be. But, taking all his testimony together, I am not by any means satisfied that a discharge should be withheld because the books were not properly kept. For instance, and as a fair sample of Mr. Jewett's testimony, he says, in one place: "I think a competent person could have ascertained from the books of 1875 and 1876, and after I executed the notes spoken of, the financial situation—the amount of my liabilities. It would have been from the books and papers that I had. I don't know whether such a person could have ascertained them from the books of account of S. A. Jewett & Co.; from the books alone, or not. They could have come very near it; might not have been able to get it exactly, perhaps. They might have overlooked something—the book-keeper, or the competent person who might make the examination."

Then the counsel asks this question: "I want to know if you swear here that your books showed such a state of facts that any competent person could have ascertained from these books the amount of the liabilities of the firm of S. A. Jewett & Co. in the fall of 1875, or in the month of January, 1876, after the execution of the notes you have spoken of." The answer is: "I do not swear to any such statement as that. I don't know whether they could or not. The books did not show the execution and delivery of the notes I sent east. They were liabilities in one sense—you can call it accommodation paper. I did not say any competent person could have ascertained the amount of liabilities from an examination of the books alone. I spoke of the business here—our business in Wisconsin. I did not include these notes sent down east—those accommodation notes. I did not include those in my remarks; I excepted those. I don't know whether all the other notes and drafts and bills, payable by the firm, were entered on some books of the firm or not. I think there were some on stubs that were probably not in the account-book. I do not think that the ledger would show everything

not at Jewett's mills. I think the ledger at Cedar Falls would show the notes. I think a competent book-keeper could have made up a correct statement of our liabilities after an examination of the books and papers. I don't think the books were all kept up perfectly. By papers, I mean statements of indebtedness on file from parties I was dealing with. There was a merchandise account kept at Cedar Falls, I think; kept all the time. There was no regular merchandise account kept at Jewett's mills. I kept an open account with every party with whom I dealt, but my books were not kept up complete with those parties. I relied a good deal on the statements in their accounts. They used to send me, every month, their account, which I examined carefully. I refer to people of whom I bought goods," etc. In another place he says: "To have made up a proper statement, it would have been necessary to have examined other papers, bill-books, and stub books."

I am not able to conceive, from statements like these, made by one who did not keep the books, and says he does not know what they contain, in the absence of the books themselves, and in the absence of the testimony of any one of the many book-keepers employed from time to time to keep them, that the books were not properly kept, within the meaning of the law. That they were not *perfectly* kept, may be inferred from the testimony of Mr. Jewett; that they were intended to be fairly and properly and honestly kept, I am equally convinced. But that the omissions of proper entries were so extensive as to materially injure or impair the efficacy and object for which they were kept, and so defeat the bankrupt's right to a discharge, I am not able to find from the evidence submitted. It is clear that the accommodation notes which S. A. Jewett individually executed and sent east for the accommodation of his brothers were not entered on the books of S. A. Jewett & Co. But I cannot see, although such a transaction might affect the business of the firm in the end, that these notes were the proper subject of entry on the books of the firm of S. A Jewett & Co. All the account he could keep of them was a memorandum to show the contin-

gent liability. I am not able to see how they could have been entered and carried through on the books of the firm.

Again, it appears that the money he received from a certain lumber agent of the firm, and expended himself personally in the business, did not go upon the regular account books kept by the book-keeper, but that he kept that account himself on a separate book. This was as a matter of convenience, and I cannot say that it was not allowable. The firm was doing a large lumber and logging business in a new country. The small mercantile business was merely incidental, and it is not to be expected that the books of such a firm will be kept with the same systematic precision and uniformity as the books of a banker or merchant in the city. The law wisely refrained from laying down any rigid rule on the subject, leaving each case to stand upon its own merits and be judged by its own circumstances; and it is very evident that what would be judged as proper and sufficient in one business and in one set of circumstances, might not in another.

Upon the whole, I think the finding upon the specifications should be for the bankrupt, and that he should be entitled to his discharge.

An order will be entered accordingly.